IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

HENRY KENDRICK,                    )
                                   )
            Plaintiff,             )
                                   )
                                   )        CIV-07-719-F
v.                                 )
                                   )
MICHAEL J. ASTRUE,                 )
  Commissioner of Social Security  )
   Administration,                 )
                                   )
            Defendant.             )

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of

Defendant Commissioner denying his application for supplemental security income benefits

under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423.   Defendant has

answered the Complaint and filed the administrative record (hereinafter TR___), and the

parties have briefed the issues.   The matter has been referred to the undersigned Magistrate

Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B).   For the following

reasons, it is recommended that the Commissioner's decision be reversed and remanded for

further administrative proceedings.

I. Procedural History

Plaintiff protectively filed his application for Title XVI benefits on March 26, 2004.

(TR 49-51).  Plaintiff alleged that he was disabled due to depression, foot pain, and back pain.  (TR 66).  Plaintiff stated he stopped working on March 1, 2003, and that he had previously worked as a janitor/maintenance worker  and as a laborer for a brick mason. (TR 66, 67, 75).  In a written pain questionnaire, Plaintiff responded that he walks everywhere, does not drive, cleans his house, and cannot work due to inability to concentrate and pain in his feet, back, and neck. (TR 83).  He indicated he takes non-prescription pain relievers and anti-depressant medication. (TR 84, 88).

Plaintiff's application was denied in initial and reconsideration administrative proceedings. (TR 22).  At Plaintiff's request, a hearing *de novo* was conducted before Administrative Law Judge Thompson ("ALJ") on September 14, 2006. (TR 308-334).  At this hearing, Plaintiff and a vocational expert ("VE") testified.  Plaintiff testified that he was forty-two years old, had a tenth grade education limited to mostly special education classes, had not passed a driver's test or received a high school equivalency degree, could not write much more than his name, had not engaged in substantial gainful activity after March 2003, and was taking anti-depressant medication.  Plaintiff also testified that he had "good" days during which he felt happier and did not hear voices and that more often he had "bad" days during which he did not feel like getting up or going outside  and just watched television and sat around. He testified that anti-depressant medication was helpful and that he could "do kind of okay" if he took his anti-depressant and sleeping aid medications.  Plaintiff also described mood swings causing him to have "angry and hateful" emotions occasionally and to want to isolate himself from other people.  Plaintiff described previous alcohol addiction,

sobriety since April 2004 (except for one brief relapse), difficulty with memory and headaches that he related to a bicycle wreck in 2002 or 2003, and difficulty with walking on his right foot following right ankle surgery seven to eight years earlier.   Plaintiff indicated he lived in federally-assisted housing, collected cans for recycling to help pay his bills, and received food stamps.  He also indicated that he had advised his case manager at his treating mental health center that he would be interested if a training or work program was offered there.  Plaintiff's attorney requested that the ALJ order consultative cognitive testing because such testing had not been completed before, Plaintiff had no funds, and Plaintiff's "slow ... nature" and evidence of a "downturn in [Plaintiff's] cognitive abilities" warranted such testing.  (TR 332-333).

Subsequently, the ALJ issued a decision in which the ALJ found that despite Plaintiff's severe physical and mental impairments Plaintiff was not disabled within the meaning of the Social Security Act. (TR 14-19).  Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council. (TR 6-9).   Plaintiff now seeks judicial review of the final decision of the Commissioner embodied in the ALJ's determination.

II. <u>Standard of Review</u>

Judicial review of this Complaint is limited to determining whether the Commissioner's decision is based upon substantial evidence and whether the correct legal standards were applied. <u>Emory v. Sullivan</u>, 936 F.2d 1092, 1093 (10th Cir. 1991). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." <u>Musgrave v. Sullivan</u>, 966 F.2d 1371, 1374 (10th Cir. 1992).  Because "all the

3

ALJ's required findings must be supported by substantial evidence," Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999), the ALJ must "discuss[ ] the evidence supporting [the] decision" and must also "discuss the uncontroverted evidence [the ALJ] chooses not to rely upon, as well as significantly probative evidence [the ALJ] rejects." Clifton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996). The court may not reweigh the evidence or substitute its judgment for that of the Commissioner. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1498 (10th Cir. 1992). However, the court must "meticulously examine the record" in order to determine whether the evidence in support of the Commissioner's decision is substantial, "taking into account whatever in the record fairly detracts from its weight." Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004)(internal quotation omitted).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i), 1382c(a)(3)(A). The Commissioner applies a five-step inquiry to determine whether a claimant is disabled. See 20 C.F.R. § 416.920(b)-(f) (2007); see also Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005)(describing five steps in detail). Where a *prima facie* showing is made that the plaintiff has one or more severe impairments and can no longer engage in prior work activity, "the burden of proof shifts to the Commissioner at step five to show that the claimant retains sufficient residual functional capacity (RFC) to perform work in the national economy, given

4

[the claimant's] age, education, and work experience." <u>Grogan</u>, 399 F.3d at 1261; <u>accord</u>,

<u>Channel v. Heckler</u>, 747 F.2d 577, 579 (10th Cir. 1984).

III. <u>Medical Record</u>

The medical record reflects that on March 20, 2004, Plaintiff was transported to a

hospital emergency room after family members found him to be unresponsive. (TR 177-184).

Plaintiff reported to the attending nurse that he had consumed alcohol "all day" in an effort

to "get some sleep." (TR 180).  The attending physician diagnosed alcohol ingestion and

transferred Plaintiff to the custody of law enforcement officers for detoxification purposes.

(TR 178, 180).  On March 29, 2004, Plaintiff underwent an intake psychosocial evaluation

at North Care Center/Community Counseling Center where he described a depressed mood,

insomnia, no interests or motivation, fatigue, difficulty in concentrating and focusing,

suicidal ideation, auditory hallucinations, and a long history of alcohol abuse and

dependence. (TR 259).  Plaintiff stated he had difficulty with reading and writing, did not

graduate high school, had a 19-year-old handicapped son who lived in a foster home, and had

used alcohol almost daily since age 30. (TR 259).  He denied mental health treatment other

than his recent hospitalization at a local crisis center for suicidal ideation and alcoholism.

(TR 259).  He stated that his "feet and back hurt" but he did not know why. (TR 259).  The

examining counselor diagnosed Plaintiff with major depressive disorder, recurrent, with

psychotic features and history of alcohol dependence, and an Axis V Global Assessment of

Functioning ("GAF") score of 44.[1] (TR 260). The examining counselor also indicated that Plaintiff exhibited slowed speech, depressed and angry mood, flattened affect, poor interpersonal skills, below average intellectual capacity, impaired attention span, severe mental illness, delusions and paranoid thought content, and lack of insight. (TR 268).

In April 2004, Plaintiff began seeing a social worker (a "case manager") and a psychiatrist at his treating clinic. The case manager noted in April 2004 that Plaintiff was living with his brother, was getting food stamps, had applied for social security disability benefits, and had no job or transportation. (TR 252). His treating psychiatrist, Dr. Bhupathiraju, noted in April 2004 that Plaintiff reported he had been depressed for two years, he had difficulty sleeping and concentrating, he had consumed alcohol until one week earlier, he heard voices, and he had mood swings, racing thoughts, and feelings of worthlessness. (TR 222). The psychiatrist indicated that Plaintiff's psychomotor activity was low, Plaintiff's speech was coherent, his mood was depressed, his affect was normal, he had no suicidal ideations or auditory or visual hallucinations, he was oriented, his memory was good, he had average intelligence, and his concentration was poor. (TR 223). The psychiatrist indicated a diagnosis of major depressive disorder, recurrent, moderate, a history of alcohol

---

[1]The diagnosis of mental impairments "requires a multiaxial evaluation" in which Axis I "refers to the individual's primary clinical disorders that will be the foci of treatment," Axis II "refers to personality or developmental disorders," Axis III "refers to general medical conditions," Axis IV "refers to psychosocial and environmental problems," and Axis V "refers to the clinician's assessment of an individual's level of functioning, often by using a Global Assessment of Functioning (GAF), which does not include physical limitations." Schwarz v. Barnhart, No. 02-6158, 2003 WL 21662103, at *3 fn. 1 (10th Cir. July 16, 2003)(unpublished op.)(citing the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM IV)(4th ed. 1994), pp. 25-32).

dependence, and a GAF rating of 50. (TR 223). Plaintiff was prescribed anti-depressant and sleeping aid medications. (TR 223). The treating psychiatrist noted in May 2004 that Plaintiff's speech was slow and his affect was constricted. (TR 218). Plaintiff's anti-depressant and sleeping aid medications were increased in May 2004 because of continuing depression. (TR 215).

Plaintiff underwent a consultative physical examination in June 2004 conducted by Dr. Paul. (TR 102-106). Plaintiff complained of back pain for 10 to 15 years, treated with warm baths, and foot pain, treated with warm baths and staying off his feet. (TR 102-103). Plaintiff stated that he took anti-depressant medication and occasional dizziness. (TR 102). Plaintiff reported he drank a case of alcohol per month and lived with his family. (TR 103). The physician's report of his physical examination of Plaintiff indicated that the exam was normal except for mild crepitation in the right shoulder area, significant dental disease, mild bilateral hallux valgus (bunion deformity), and ulnar deviation in all remaining toes of both feet. (TR 105-106).

In July 2004, the psychiatrist noted that Plaintiff exhibited an anxious mood and was experiencing paranoid delusions, auditory hallucinations, and decreased sleep. (TR 212). Plaintiff did not show up for intervening appointments until January 2005, when the treating psychiatrist noted that Plaintiff exhibited depressed mood, auditory hallucinations, and described decreased sleep and appetite. (TR 207). The diagnosis noted was major depressive disorder, recurrent, with psychosis. (TR 207). The psychiatrist noted Plaintiff was not compliant with the prescribed medications, and anti-depressant and sleeping aid medications

were prescribed. (TR 206-207).   Plaintiff's case manager at his treating clinic noted in January 2005 that Plaintiff's food stamps had expired and he had no food. (TR 248).   The case manager provided Plaintiff with food baskets and composed a letter for Plaintiff to take to the state agency for renewal of his food stamps. (TR 248).   In February 2005, the psychiatrist noted Plaintiff exhibited depressed and anxious mood, delusions, hallucinations, decreased sleep, and decreased appetite. (TR 204).   Plaintiff's case manager noted in February 2005 that Plaintiff was living with his brother and had no transportation, so the case manager assisted Plaintiff in completing an application for a bus pass. (TR 247).   Plaintiff's anti-depressant medication was increased. (TR 203-204).

In March 2005, the psychiatrist again noted that Plaintiff exhibited depressed and anxious mood, delusions, and hallucinations.   The diagnosis remained the same. (TR 202). Plaintiff's case manager noted in March 2005 that Plaintiff was still living with his brother and was getting food stamps and waiting for a decision on his social security disability application. (TR 246).   The case manager encouraged Plaintiff to get a "temporary job" until his disability application was settled. (TR 246).   In April 2005, Plaintiff's case manager noted that Plaintiff had not worked and he was encouraged to pick up and recycle cans for some financial benefit.   Plaintiff was referred to a free medical clinic after he complained his feet hurt. (TR 245).

Plaintiff's case manager noted in May 2005 that Plaintiff reported he had obtained a "temporary janitorial job in which he works two or three days weekly and received $20-$30 each day he completes the job." (TR 243).   In June 2005, his treating psychiatrist noted that

Plaintiff exhibited anxious mood, delusions, and hallucinations. Plaintiff was prescribed a medication used to treat bipolar disorder[2] in addition to the anti-depressant medication previously prescribed for Plaintiff. (TR 196-197). Plaintiff's case manager noted in June 2005 that Plaintiff had contacted an attorney to assist him with a disability appeal and that the attorney had advised him to quit his temporary janitorial job "where he was making 20-30 dollars a week." (TR 242).

Two weeks later Plaintiff complained to his case manager of not having any money and the case manager noted she encouraged him to collect cans. (TR 241). In August 2005, Plaintiff's psychiatrist noted that Plaintiff exhibited depressed mood, delusions, and hallucinations. (TR 194). Plaintiff's case manager noted in August 2005 that Plaintiff was homeless because he could not get along with his brother, that he was staying at a homeless shelter, and he was collecting cans for money for his basic needs. (TR 238). He was encouraged to go to the local Salvation Army for clothing, and the case manager provided him bus passes so that he could attend his psychiatric appointment. (TR 238). In September 2005, Plaintiff's case manager assisted him by calling a public housing manager and vouching for Plaintiff's eligibility to receive public housing benefits. (TR 228).

Plaintiff's case manager and treating psychiatrist completed a mental health service plan for Plaintiff in September 2005. (TR 233-240). Significantly, the treatment plan includes the mental health professionals' findings that Plaintiff displayed "extreme

---

[2]See http://www.seroquel.com/cbip/on/seroquel/understanding-seroquel.aspx?sid=18763.

depression disparity" and that due to symptoms of "extreme depression, suicidal ideation and alcoholism" Plaintiff was "unable to relay thoughts and speech in an effective manner." (TR 233). He also "require[d] assistance with writing and some reading" according to the case manager. (TR 233). The treatment plan also includes the findings that due to Plaintiff's symptoms of "disorder including extreme depression with psychotic features, [Plaintiff was] unable to work" and that due to Plaintiff's depression and suicidal ideation he had "let his health deteriorate and require[d] assistance accessing free or low cost health care due to unemployment." (TR 234). A GAF rating of 48 was noted in the September 2005 written mental health service plan. (TR 229).

Plaintiff's psychiatrist noted in October 2005 that Plaintiff was depressed and experiencing delusions and hallucinations. (TR 189). Plaintiff's medications were continued. (TR 188, 189). Similar observations were noted by the psychiatrist in November 2005 although delusions were reportedly absent. (TR 302).

In October 2005, Plaintiff sought emergency room treatment at a hospital for right ankle pain, which he described as steadily worsening since right ankle surgery 6 or 7 years previously. (TR 186). He described chronic pain and swelling, worsening with standing, and pain radiating up the right leg, as well as pain in both feet and all of his toes. (TR 186). Plaintiff stated he was not taking medications, and a physical examination was unremarkable. (TR 186-187). The examining physician declined to x-ray Plaintiff's right ankle, and indicated Plaintiff needed to fill the prescription he obtained earlier at another hospital's emergency room for an anti-inflammatory medication and needed a primary care physician.

(TR 187).

In October 2005, Plaintiff's case manager noted that he assisted Plaintiff by calling and setting up an appointment with an attorney to assist Plaintiff in his social security disability appeal and also assisted Plaintiff by setting up an appointment for him at a medical clinic. (TR 226).  In November 2005, Plaintiff received assistance from his case manager to locate housing at a shelter and free meals, and the case manager provided Plaintiff bus tokens for transportation.  (TR 225).

The record indicates that Plaintiff may have remained homeless from August 2005 until sometime after April 2006. (TR 224, 225, 228, 238, 270).  A treating physician at a free medical clinic, Dr. Samant, noted in February 2006 that Plaintiff sought treatment for foot pain memory loss, appeared to be "very depressed," and was taking anti-depressant medication. (TR 276).  Plaintiff reported he was picking up a few cans a day and was homeless. (TR 276).  The physician further noted that Plaintiff "seems to be more depressed than actually having memory loss." (TR 276).  Dr. Samant again noted in March 2006 that Plaintiff had memory loss and a depression disorder, and the physician also noted that Plaintiff reported he was living in his brother's "old van" where he stated he had been living there "for 1-2 years." (TR 274).  Dr. Samant noted Plaintiff's depression "may be the cause of his disinterested [sic] in life in general and his memory loss." (TR 274).  Dr. Samant noted in April 2006 that Plaintiff had memory loss and a depression disorder, that the depression might be responsible for some of his memory loss, but that Plaintiff was "more disinterested" than actually experiencing memory loss. (TR 270).  Plaintiff inquired in April 2006 at the

11

treating clinic for assistance with quitting smoking. (TR 272).

In April 2006, Plaintiff's treating psychiatrist noted that Plaintiff exhibited no depression or other abnormal symptoms, although he complained of adverse side effects to the anti-depressant medication which was changed. (TR 293-294). Plaintiff's anti-depressant medication was changed again in May 2006 due to side effects, and the psychiatrist noted Plaintiff was depressed and anxious. (TR 292). Plaintiff reportedly exhibited only mild depression in June 2006. (TR 289). In August 2006, the psychiatrist noted Plaintiff exhibited depression, anxiety, irritability, a constricted affect, and he described auditory hallucinations. (TR 285). His anti-depressant medication was increased. (TR 284-285).

IV. Credibility

Plaintiff does not challenge the ALJ's findings at steps two and three. The ALJ found at step two that Plaintiff had severe impairments due to depression and cervical degenerative disc disease. At step three, the ALJ found that Plaintiff's impairments were not disabling *per se.* With respect to Plaintiff's impairments due to depression and alcohol dependence, the ALJ found that these impairments had resulted in functional limitations, including moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. At step four, the ALJ found that despite Plaintiff's impairments he had the residual functional capacity ("RFC") to perform work at the medium exertional level, restricted to the performance of simple tasks on a routine basis. (TR 17).

Plaintiff contends that the ALJ's credibility determination is flawed and is not

supported by substantial evidence.  Plaintiff asserts that the ALJ relied on two main reasons for finding Plaintiff's subjective assertions of disabling symptoms were not credible, including (1) his history of alcohol dependence and substance abuse and (2) his continuing to smoke despite a doctor's advice to quit smoking.  Plaintiff contends that these reasons do not support the ALJ's credibility determination because the evidence shows Plaintiff changed his behavior and stopped abusing alcohol in early 2004 and because Plaintiff's addiction to smoking makes non-compliance with a doctor's advice an unreliable basis on which to rest a credibility determination.  Defendant responds that no error occurred in this respect and that the Commissioner's credibility determination is well supported by the evidence.

At the fourth step of the evaluation process, the ALJ is required to determine whether the claimant retains the RFC to perform the requirements of all past relevant work.  The claimant bears the burden of proving an inability to perform the duties of the claimant's past relevant work. See Andrade v. Secretary of Health & Human Servs., 985 F.2d 1045, 1051 (10th Cir. 1993).  At this step, the ALJ must "make findings regarding 1) the individual's [RFC], 2) the physical and mental demands of prior jobs or occupations, and 3) the ability of the individual to return to the past occupation, given his or her [RFC]." Henrie v. United States Dep't of Health & Human Servs., 13 F.3d 359, 361 (10th Cir. 1993).  The assessment of a claimant's RFC necessarily requires a determination by the ALJ of the credibility of the claimant's subjective statements. "Credibility determinations are peculiarly within the province of the finder of fact, and [courts] will not upset such determinations when supported by substantial evidence." Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 777

(10th Cir. 1990).  However, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." <u>Huston v. Bowen</u>, 838 F.2d 1125, 1133 (10th Cir. 1988)(footnote omitted).

The ALJ found that Plaintiff's subjective complaints were not "credible to the extent alleged." (TR 18).  The ALJ's decision explains this credibility finding.  With respect to Plaintiff's allegations of disabling physical and mental limitations, the ALJ reasoned that Plaintiff's "[t]reatment has been essentially routine and/or conservative," Plaintiff had not required ongoing treatment or treatment by a specialist for his back or foot conditions, Plaintiff had not been prescribed narcotic pain medications, and Plaintiff had not alleged side effects from his anti-depressant medication. (TR 18).

The ALJ further reasoned that although Plaintiff alleged memory loss Dr. Samant had "indicate[d] memory loss may be due to depression and/or disinterest in life versus actual memory loss." (TR 18).  Additionally, the ALJ reasoned that Plaintiff had "report[e]d situational stressors such as being homeless, loss of a job and family, and alcohol dependence," that Plaintiff "worked only sporadically prior to the alleged disability onset date, which raise[d] a question as to whether the claimant's continuing employment is actually due to medical impairments," that Plaintiff's "case manager encouraged him to work," and that he had reported his attorney advised him to quit his janitorial job because if the agency found out he was able to work he would not be allowed benefits. (TR 18).

The ALJ also reasoned that Plaintiff "ha[d] been less than candid in reporting his history of polysubstance abuse," noting that in February 2006 Plaintiff had denied any

14

history of substance abuse and had "appeared to be reserved in revealing any history about substance use," and that Plaintiff "admitted at the hearing that he smoked marijuana up to at least 2001." (TR 18). According to the ALJ, in March 2004 Plaintiff reported he had used alcohol almost daily since age 30 and began drinking at age 15, he was "referred for alcohol detox in March 2004," and "in June 2004 he reported drinking a case of alcohol a month." (TR 18). Finally, the ALJ reasoned that Plaintiff "continue[d] to smoke despite being advised by his doctor to stop, which further diminishes his credibility because of failure to follow medical advice." (TR 18-19).

The record certainly supports the ALJ's findings that Plaintiff's complaints of disabling physical limitations due to foot, leg, and back pain were not consistent with the medical evidence. To this extent, the ALJ's credibility determination is well supported by the record. Plaintiff's treating and examining physicians did not find evidence of a physical impairment that could account for Plaintiff's allegations of chronic foot, leg, and back pain, and the report of the consultative examiner reflected no findings of disabling pain or exertional limitations stemming from a pain-causing impairment.

The ALJ's credibility determination is troubling, however, with respect to Plaintiff's severe mental impairments. The ALJ's decision does not reflect the ALJ's consideration of the persistent findings of depression, anxiety, and psychotic symptoms entered by Plaintiff's treating counselor, treating psychiatrist, and treating physician. Nor does the ALJ's decision reflect consideration of the Plaintiff's counselor's and psychiatrist's assessments that Plaintiff continued to suffer extreme depression despite ongoing anti-depressant medications and was

15

unable to work.   Moreover, the ALJ's decision provides no indication that the ALJ considered the low GAF ratings given to Plaintiff by his treating mental health professionals during 2004 and 2005, all of which indicated severe functional limitations caused by Plaintiff's mental impairments,[3] or provided a reason to disregard the opinions of Plaintiff's treating mental health sources in this respect.  See Watkins v. Barnhart, 350 F.3d 1297, 1301 (10th Cir. 2003); Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987).

The ALJ summarized the evidence of Plaintiff's long-term homelessness and other evidence of his significant functional difficulties in maintaining family and social relationships and maintaining employment as "situational stressors."  This term, which indicates only temporary and often normal life changes, is not consistent with the record of Plaintiff's ongoing mental health treatment during the three year period preceding the ALJ's decision.  Moreover, Dr. Samant's statement that Plaintiff's memory loss could be due to depression supports, rather than detracts from, the credibility of Plaintiff's allegation that his depression caused severe, disabling functional restrictions.  The ALJ also mischaracterized Dr. Samant's office notes.  In February 2006, Dr. Samant noted that Plaintiff sought treatment, in part, for memory loss, but Dr. Samant's assessment was that Plaintiff was "more depressed than actually having memory loss." (TR 276).  On April 12, 2006,.  Dr. Samant

---

[3]Plaintiff was assessed GAF scores of 44, 48, and 50 over a two year period. A GAF rating between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation ...) OR any serious impairment in social, occupational, or school functioning (e.g., ... unable to keep a job). American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders, at 34 (Text Rev. 4th ed. 2000).

assessed Plaintiff as having "depression." (TR 270).  Dr. Samant stated that Plaintiff's depression "may be responsible for some of his memory loss problems" and that Plaintiff's depression had resulted in his being "more disinterested than actually [experiencing] memory loss." (TR 270).

Although it is clear, as the ALJ pointed out, that Plaintiff "worked only sporadically prior to the alleged disability onset date," the ALJ did not expressly consider whether Plaintiff's sporadic work history was related to his severe mental impairments.  Rather, the ALJ merely concluded without further explanation that Plaintiff's sporadic work history somehow "raise[d] a question" about the reasons for Plaintiff's continuing unemployment. (TR 18).   Where as in this case there is evidence of  severe mental impairments resulting in significant functional restrictions, a claimant's sporadic work history is not inconsistent with a finding of disability.   See Thompson v. Sullivan, 987 F.2d 1482, 1490 (10th Cir. 1993)(noting "[t]he sporadic performance of [household tasks or work] does not establish that a person is capable of engaging in substantial gainful activity"); Leidler v. Sullivan, 885 F.2d 291, 294 (5th Cir. 1989)("in cases of severe mental illness a claimant's sporadic work history does not conflict" with finding of disability, and ability to perform work but not sustain employment because of condition supports disability).

Additionally, the ALJ's rationale mischaracterizes the record in several respects.  The ALJ points out that Plaintiff's "case manager encouraged him to work."  The record reflects that Plaintiff's case manager encouraged Plaintiff to find temporary work or to collect cans or mow yards to earn some money for meeting Plaintiff's basic needs.  There is nothing in

the record indicating the case manager believed Plaintiff was capable of obtaining and maintaining full or even part-time work.   During this period of time, the record shows Plaintiff was either homeless or living with family members, and the case manager's notes reflect that the case manager was assisting Plaintiff in many areas, including with his social security disability claim.   With respect to the ALJ's reasoning that Plaintiff's "less than candid ... reporting [of] his history of polysubstance abuse" detracted from his credibility, this rationale also mischaracterizes the record.   Plaintiff did indeed, as the ALJ points out, deny any history of substance abuse when he sought treatment at a free medical clinic in February 2006. (TR 276).   And the treating physician, Dr. Samant, did indeed note that Plaintiff "seems to be reserved" about revealing his history of substance use.  (TR 276).   However, Dr. Samant's office note does not indicate that he questioned Plaintiff's credibility or that information regarding substance abuse was necessary for treating Plaintiff's complaint of bilateral foot pain.   Moreover, Plaintiff's treating psychiatrist repeatedly noted during 2004, 2005, and 2006 that no substance abuse was observed or reported. (TR 189, 194, 197, 202, 204, 207, 212, 215, 218, 285, 289, 292, 294, 296, 302, 304).   The ALJ did not discuss this favorable evidence in making his credibility determination.

The ALJ also reasoned that Plaintiff "admitted at the hearing that he smoked marijuana up to at least 2001." (TR 18).   No such admission appears in the record of the administrative hearing.   Plaintiff described one incident in which he smoked marijuana in 2001 or 2002, and he stated that "that's about as much drug use as I've had besides the prescriptions that the doctors give me to take." (TR 326).   Consistent with Plaintiff's

statement, a drug screen of blood drawn from Plaintiff at a hospital emergency room was negative for the presence of any illegal substances in May 2005. (TR 148).

The ALJ evaluated Plaintiff's depression and substance addiction disorder under the governing statutes and regulations, see 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04 (listing for affective disorders), §12.09 (listing for substance addiction disorders), and found that Plaintiff's severe mental impairments had resulted in only moderate functional limitations. As support for these findings, the ALJ pointed to only one psychiatric evaluation of Plaintiff in April 2004, the ALJ's own conclusion that "[i]t appears his activities are restricted due to lack of motivation," and the residual functional capacity assessment ("RFC") made by the state agency non-examining consultative physicians. (TR 17-18). The record provides significant evidence of ongoing treatment of Plaintiff for depression with psychotic features. The ALJ did not discuss the extensive treating mental health source's progress notes or assessments of his functional level during the three year period preceding the ALJ's opinion, all of which were favorable to Plaintiff's assertion of disabling mental impairments that rendered him unable to work. See Oslin v. Barnhart, 69 Fed. Appx. 942, 947 (10th Cir. 2003)("GAF scores of 50 or less do suggest an inability to keep a job."). In light of the record, the ALJ's conclusory assessment of Plaintiff's "lack of motivation" is not supported by the record. The state agency consultative physician's RFC assessment was made in July 2004 (TR 111-113), before the majority of the medical record was compiled with respect to Plaintiff's mental impairments. Thus, this document did not provide evidence supporting the ALJ's credibility or RFC findings.

Moreover, nothing in the record supports the ALJ's statement Plaintiff continued to smoke cigarettes after having been "advised by his doctor to stop" smoking.[4] (TR 18-19). There is one brief note in the record indicating that in April 2006 Plaintiff asked for assistance in quitting smoking. (TR 272). The ALJ's lay opinion that Plaintiff failed to comply with prescribed treatment is therefore an improper basis for rejecting the credibility of Plaintiff's allegation of disabling mental impairments.

"The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability." Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir. 2004). An ALJ "may not ignore evidence that does not support his decision, especially when that evidence is significantly probative." Briggs ex rel. Briggs v. Massanari, 248 F.3d 1235, 1239 (10th Cir. 2001)(quotation omitted). Because the ALJ's failed to address the medical evidence supporting Plaintiff's testimony, particularly the treatment records of his psychiatrist and case manager, mischaracterized other evidence, and failed to follow the pertinent law and regulations with respect to the consideration of treating doctor's opinions and substance disorders, there is not substantial evidence in the record to support the ALJ's credibility determination. See Thompson v. Sullivan, 987 F.2d 1482, 1490 (10th Cir.

---

[4]In May 2005, Plaintiff sought emergency room treatment for dizziness. The record contains a discharge instruction form from the hospital advising Plaintiff that for his headaches he should take several conservative measures, including massaging his head and neck, resting in a quiet, dark room for 20 to 30 minutes, using warm or cold packs, exercising 15 to 30 minutes a day, sleeping 6 to 8 hours each night, keeping a headache diary and avoiding smoking, alcohol and caffeine. (TR 144). The discharge instruction form was signed by Plaintiff and a registered nurse. (TR 145). This form does not qualify as prescribed treatment by a treating physician to stop smoking, as the ALJ suggests in the decision. (TR 18).

1993)("Although this court ordinarily defers to the ALJ as trier of fact on credibility, ... deference is not an absolute rule.").  Plaintiff testified at the administrative hearing in September 2006 that he lived by himself in a federally-assisted apartment, received food stamps, and that he picks up cans from the apartment's dumpsters and made $13.00 from recycling cans the previous month. (TR 311, 327-328). He was homeless as recent as April 2006.  (TR 270).  Plaintiff's minimum daily activities do not establish that he can maintain a job on a consistent basis.  Here, the Plaintiff's testimony and the record as a whole supports Plaintiff's assertion that his mental impairments rendered him unable to work.  Accordingly, there is not substantial evidence to support the ALJ's credibility determination. Because the ALJ's RFC assessment was based on a faulty credibility finding, the ALJ's RFC assessment is subject to reversal as well, and the Commissioner's step four decision should be reversed and remanded for further administrative proceedings to allow the Commissioner to reevaluate the credibility of Plaintiff's subjective allegations of disabling mental impairments and his remaining ability to work, if any.

RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter REVERSING the decision of the Commissioner to deny Plaintiff's applications for benefits and REMANDING the matter for further administrative proceedings consistent with this Report and Recommendation.  The parties are advised of their respective right to file an objection  to this Report and Recommendation with the Clerk of this Court on or before April 21st    , 2008, in accordance with 28 U.S.C. § 636 and LCvR 72.1.  The parties are

further advised that failure to file a timely objection to this Report and Recommendation waives their respective right to appellate review of both factual and legal issues contained herein. <u>Moore v. United States</u>, 950 F.2d 656 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this _____31st_____ day of _____March_____, 2008.


GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE